May it please the court, my name is Andy Burrell, I represent the appellant Preston Forthoon in this case. This is a case that belonged in state court, not federal court. Rather than allege an offense against the United States, the indictment alleged the violation of a Minnesota state law, that is the Minnesota state runner statute, which says if a chiropractor uses a runner to get a patient, he commits a felony. And bills submitted for treating the patient are quote non-compensable and unenforceable as a matter of law, end of quote. The indictment alleged three theories of fraud. First, that they committed fraud by violating the Minnesota state runner statute. Second, they committed fraud by concealing that they were using runners in violation of the Minnesota state runner statute. In other words, because they used the runner and didn't disclose it, it was a material fact. Third, it alleged they committed fraud by using runners and therefore billing for treatment that was unnecessary and not done. In other words, we know it was not medically necessary because the patient obtained via a runner. That's the it's obvious argument the United States made in closing. All three of these theories were about runners, but the first theory was exclusively predicated on the existence of this Minnesota statute. That is, the prosecution could not have been brought if this statute did not exist. And we know this is what the government was alleging because they admitted exactly this. In the government's response to our motions to dismiss the indictment, the government said, and I'm quoting, as alleged in the indictment, the claims were fraudulent for multiple reasons. At the most basic level, they were fraudulent because they were the product of runner payments and were therefore quote non-compensable and fraudulent because at the most basic level, they were simply ineligible for payment because they were the product of runner payments. So the government is saying if you use runners, it's fraud. Indeed, in its closing argument, the government doubled down, making clear they were saying using a runner was sufficient to commit mail or wire fraud. Are they are they saying it as a I mean, maybe they were making the argument as a categorical matter, but weren't they also making a point that if if the insurance companies would have known they would have done further investigation and uncovered perhaps some fraud if fraud existed and that's what made that's what made a difference here as well? Well, they said that, but they also told the jury on page one hundred one thousand seven hundred fifty eight. The scheme here, it's a no fault insurance fraud scheme, and there were many means of accomplishing this scheme, paying the kickbacks to runners, the patients concealing the payments, failing to disclose the payments, billing for unnecessary and unreasonable payment and treatments. So they're saying that simply using the runner is sufficient. But they're saying that the reason why is because I mean, that suggests that that, you know, that it would have been material to their determination that they would have they would have. I mean, there are a lot of reasons why using not just per se rule, but there are a lot of reasons why using the runners would have led them to believe that fraud was taking place. Well, what the indictment alleged was three different theories, and one of the theories that is Correct. Yes. Okay. They also allege this materiality theory, which is what I understand your question. Correct. Yes. Okay. But this was a theory that was based entirely on state law. And interestingly, on that question, yes, was the was it discussed whether the government's theory that you're that was enacted after the Supreme Court of Minnesota interpreted as fraud related in Peach versus Board of Chiropractor Examiners? I don't remember that being discussed, Your Honor. Hmm. None of you cited that case. And it had, of course, it was directly aimed at another statute, but it had a footnote because this statute had just been enacted. I don't remember that being discussed. Okay. So we have, I think that the Peach case destroys any notion that this was inherently fraudulent. Indeed, they reversed a licensing revocation. That sounds like a well-decided case. Well, it was unanimous by Justice Page. So, you know, it's interesting that, you know, our contention is this is a state law that they tried to turn into a mail fraud case. And it's interesting to me that there are seven states in the Eighth Circuit. And Minnesota makes the use of runners in these circumstances a felony. Arkansas makes the use of runners a misdemeanor. And all the other states have no such prohibition. And mail fraud is not a scheme to defraud based on whatever state you live in. And this is an example of why it's improper to use a state law to create a federal mail fraud prosecution. And accepting the government's theory here would make substantive federal law different in each state. State law can certainly affect the materiality inquiry. I mean, the... Well, sure. But what you have is a situation where there's seven states, five of them have no such law. One's a felony, one's a misdemeanor. And so it depends what state you're in, whether you commit mail fraud. Sort of the eerie doctrine of mail fraud, I guess. Statutes like federal mail and wire fraud statutes must be strictly construed to avoid extending limits beyond the limits intended by Congress. When the government alleges the violation of the state criminal law here as a basis for a federal mail fraud scheme to defraud, it's not really a scheme to defraud. It's a conspiracy to violate a state law statute, which is not an offense against the United States. And it is not what the federal and mail fraud wire statutes say they criminalize. The government says we didn't preserve this argument in the district court and the court should review for plain error. Well, this is error. The government's wrong. We repeatedly challenged this theory. We moved to dismiss the original indictment on these grounds, the first superseding indictment on these grounds, the third superseding indictment on these grounds. There's a specific docket, minute entry for that, docket number 349. We moved for a judgment of acquittal after the government's case. We moved for a judgment of acquittal after the defense rested. We moved for a judgment of acquittal again after a verdict submitting a 12-page memo to support that. The government is just plain wrong to claim that we never apprised the lower court of this position and the court didn't have a chance to rule on it. The court had a chance, many chances to rule on it and just disagreed with us. What happened in this case is that there were three theories of liability presented to the jury. One of them is wrong. It's not a proper basis for a verdict. The jury entered a general and under Stromberg versus California, that verdict can't stand. That's the red flag case. In responding to these challenges in the district court, whenever we challenged the government's theory, it would say, oh no, we're really talking about material non-disclosure or medical necessity, but the facts are the indictment, the argument at trial, and the jury instructions told the jury that a violation of the runner statute is illegal and the claims are non-compensable and it's fraud. The jury was given a copy of the indictment, which is instruction number 12. The indictment in paragraph 8 generally describes the Minnesota No-Fault Insurance Act and explains the prohibition against using runners and explains, quote, any claims for services rendered by a health care provider that resulted from the use of a runner are non-compensable and unenforceable as a matter of law, end of quote. Paragraph 11 alleges that defendant Forthune, quote, paid, quote, illegal kickbacks to the runners, end quote, and that he did so, quote, in violation of Minnesota state law, end quote. The jury instructions, instruction 15, explained as to mail fraud charge that the charge had three elements, the first of which was that the defendant voluntarily and intentionally devised or participated in a scheme to defraud or obtain money, property, or property rights by means of false representations or promises, which scheme is described in the indictment as follows, colon, the no-fault insurance fraud scheme, end quote, state law. Number 16 defined wire fraud in exactly the same manner except for wire fraud. The only question of substance asked by the jury during its deliberations suggested it was struggling to evaluate the legal theories articulated by the government. Here's the question. Do we need to consider the runner statute? Next part of the or do we just need to decide if payments to runners or patients were hidden or lied about? Last part of the question, is the existence of a runner a material fact? The district court responded, quote, you have the law before you, you must follow the jury instructions provided, end of quote. This referred them right back to the jury instructions and right back to the loss calculation. It erred because it did not attempt to credit against the loss the value of the services provided by the defendants that had value for the insurance company victims. Let me, I'd like to move that to the restitution question. Okay. Where, or then probably forfeiture as well, where the service, the value provided is an offset, in our case to say. Yep. To what extent did the defendants present evidence or argument regarding the, or argue that the government had to give you, had to allow you to, or had the insurance companies had to value, provide what value there was. If the claims would have been paid. Yes. Because services were provided. Yes. Or if only partially not paid because there might have been more than what was medically necessary. Then would that, did you argue that would be a valid offset to restitution and or forfeiture? I know with loss, fraud loss, we get into the intended loss problem, but it seems to me this issue is clear with restitution, but there may have been a burden on the defense. I think that what happened was that the district court took the loss calculation and turned it into the forfeiture and restitution. So. And that wouldn't have, but that could, that couldn't have been its intended loss finding. Actual loss. Right. Actual loss. Yeah. Was the actual loss finding 2.7? Yeah, the actual loss was 1.55 million. And then forfeiture was 1.2. Yeah. So you add the two together and you get what. Two points, exactly right. What the government says was intended loss, which I assume was the full amount of the claims and. Exactly right. Yes, that's what it was. Okay. So that, was it argued to the district court that when we get to restitution and forfeiture, there has to be an ability, there has to be actual loss means gross loss minus value received. Well, that was the loss calculation, of course. I don't remember that argument being made on restitution. But it was, and it was all, the restitution order was part of the sentencing. It was. It was not a separate. No. Or process for restitution or forfeiture. That's correct. They were all, they were all handled together. Thank you. Are you challenging the restitution here or just the calculation of the sentence based on losses and intended loss? I understand you're making an argument about forfeiture as well. We're challenging everything. So you are challenging restitution as well. Thank you. Thank you. Mr. Zahid. May it please the court. Good morning, honors. R.J. Zaid and Lauren Rose on behalf of the Abdeslam Hussein. In addition to the federalism arguments raised by Mr. Burrell, the government here completely failed in its proof. Assuming the runner statute was applicable as to Mr. Abdeslam Hussein, they had to prove that he met the definition of a runner under Minnesota law. That has a specific definition with six exceptions that we lay out on pages 15 and 16 of our brief. Now, wait, why did they have to prove that? Well, the reason they had to prove that, because their first theory was this is non-compensable, unenforceable. The only way you get to that is you prove if the runner statute was violated. To prove that the runner statute was violated, you have to show that the person is a runner. But a materiality claim could be constructed otherwise. Well, that's true, your honor, but the materiality again was completely refuted because during cross-examination between Ms. Rose and myself, we cross-examined all insurance representatives. And we asked them, if the injury was real, which the government didn't present any evidence that the injury wasn't real, if the accident happened, the government did not present any evidence that the accidents were staged, and the medical treatment was necessary, and the medical treatment was not unreasonable, would you pay the claim even if the runner was used, even if the runner was paid? Every single one of them said that. But that's a hypothetical. I mean, if you go to the direct examination, each of the insurance representatives also said, if you knew there were runners, would you engage an investigation and perhaps not pay the claim if you uncovered something? Would that be material to your decision to pay the claim? To get to that hypothetical, your honor, the government had to prove that the treatment was medical. They had to prove that the accident was staged. They had to prove that a runner was used. They have to prove that the injuries are not real. They have to prove that the medical... Why? I don't understand that. I mean, if it would have changed their decision, that seems to me to be material. Or if it would have changed the way they approach paying the claim, that's a material omission that made a difference to their paying of the claim. The material omission, again, the government has to show that Mr. Hussain was somehow involved and had a duty to make a statement to them about that. It was a conspiracy aid to vet conviction as to the two runners. But that's correct. But onto that, the first thing with respect to that is Mr. Hussain was not a chiropractor. The evidence was that he was not involved in any of the medical diagnosis. He was not involved in studying the medical treatments. But there was evidence that he conspired, if you will, to conceal. For his patients not to disclose. Again, there was no evidence on that. There's not a... With respect to Mr. Hussain, and I'm asking the court to focus on Mr. Hussain, not a single witness testified that Mr. Hussain concealed anything. To the contrary, Mr. Hussain came to United States in 1994 from Somalia. He became a pillar of the community and a resource for all the other Somalis who came to United States fleeing their countries. With respect, they would say, Abdi, where can we go for insurance? Abdi, where do we get our utilities? Abdi, where do we get our driver's license? Abdi, I got hurt in an accident. Where do I go? There's no dispute that he referred people there. Was there any dispute that he received kickbacks for his referrals? There was a dispute on that. That's the government's theory. And viewing the light of the government, assuming he got kickbacks to them, the government still had to prove that the treatments were medical necessary. The evidence from our perspective is he provided interpretive services that was brought out during the direct of the governor's main witness, Mr... And you don't think... I'm just throwing this out. You don't think that the testimony that there were runners, that's undisputed. Some kind of... Not legally runners, but there were people that went out and got folks to go to the chiropractic clinic. Those folks were being paid and that the insurance companies weren't told about it. You don't think that's material? Well, first of all, with respect to Mr. Hussain, you have to show that he knew about that. He knew about those practices. There was no evidence presented that he knew about those practices. That's a different issue. Fair enough. Yeah. That's the issue. He's not a chiropractor. He's not there. He doesn't see their signs. He doesn't know what they're doing. And that's a fundamental proof. When you have a conspiracy, you have to show that you knowingly, intentionally, and purposefully availed yourself of that. As we cite in the Hansen case, the fact that you stumble into what turns out to be a fraudulent scheme doesn't make you a participant. And so when you review the evidence there, your honor, we ask that the convictions be reversed because the government failed in its burden on all fronts. Every theory that they presented, they presented no evidence with respect to Mr. Hussain, with respect to the runner, medical necessity, pattern of treatment, concealment, the payment of patient referrals, the testimony of the insurance representatives, and the intent and knowledge. The fact that he was not in the clinic and not part of it, they did not show that he participated in that. And lastly, your honor raised the issue of restitution. We did argue before the district court specifically, emphatically, that the government had to prove that these people were in fact, that there was no medical necessity or medical unreasonable treatment. And we argued that the actual loss and the restitution should be zero. Thank you, your honors. Thank you. Mr. Hawkins. Good morning, your honors. May it please this honorable court. My name is Charles Hawkins. I represent Carlos Luna. Mr. Luna was charged in three counts, the conspiracy count, one count of mail fraud, one count of wire fraud, all arising from an alleged scheme that you've heard about. Mr. Luna doesn't fit the runner statute under either count. Under AOSA, Mr. Luna was a roommate of the minor child's mother. They were involved in a telephone conversation. He referred them to the clinic. This child had been hit while riding a motorcycle, or strike that, a bicycle, taken to a hospital by an ambulance, suffered significant injuries, and was treated at the Hennepin County Medical Center. He had legitimate injuries. It was a legitimate accident. The medically necessary treatments were provided. Proper 1500s were submitted. And clearly, there's evidence that $250 was given to the juvenile's mother. That $250 does not fit into the government's theory that they were paid after they attended six treatments and that they were receiving treatments in order to get the thousand dollar payments or other payments. This $250 was given to a former roommate as assistance to help her be able to get the treatments that the son required. It doesn't fit the runner statute. The $250 payment is not material, and the claim had to be paid. AOS was also treated by the cooperating chiropractor, Mr. or Dr. Hummony, who testified that all the treatments were medically necessary. He believed that they were appropriate, and every treatment he provided to AOS were supposed to be provided and were medically necessary. The bill was submitted. There is no portion of the 1500 that requires disclosure of runners. In fact, the 1500, when you submit it for payment, says you can't modify the form. If this was really material information to the insurance companies, they'd at least have a portion on the 1500 that might say, do you think there's information we should know? Was a runner used? Was the patient given any quid pro quo? We'll provide you stakes if you come to see us. We gave you $250 to come see us. There's nothing like that. The 1500 form precludes that from being disclosed. Is that a failure of proof though? I mean, if you've got the insurance companies saying this is really important to us, I mean, I don't see how that's relevant. It goes to materiality. If it's as important as the insurance company claims it is to them, even though they admit that if there's a real accident, real treatments, and they're medically necessary, we have to pay. Well, that's an argument you make at trial to the jury. They say, we presented evidence that it's really important. You say, well, it's not on the form. The jury makes a determination. And then they came back and asked questions about materiality and otherwise, and were given the direction to go back and read the indictment, which again is their theory of the case, which we respectfully submit they failed to prove under all three theories. In regard to EG, EG does not fit under the runner's statute either. It was a compensatory claim, legitimate injuries, legitimate accident, medically necessary treatment. And this individual voluntarily testified, I voluntarily chose to go to the clinic. I made the arrangements to go to the clinic. She gets told, according to the evidence, not to say anything to anybody. But this goes to the fact that that is a statement that was made, but there's no evidence to suggest that Mr. Luna had any idea about the billing practices, why there may be a statement made like this. AOS's mother testified, nobody told me not to talk to anybody about this. EG testified, nobody ever talked to me about receiving money. I went because I needed treatment. As Judge Davis said, in denying our judgment of acquittal motion, this is a very close case, but I'm going to let it go to the jury. I respectfully submit to the court, reasonable jurors could not have found Mr. Luna guilty based upon the question that they were asked, if they had been given appropriate instructions and appropriate law. Thank you. I reserve all the other time for Mr. Burrell's rebuttal. Thank you, counsel. Mr. Cheever. Thank you, your honor. May it please the court. I'm Mike Cheever. I'm with the U.S. Attorney's Office here in Minnesota. At the council table is John Kochen and one of the two AOSAs that tried the case. I'm not the other. I also have a council table, Jay Ettinger, who's a second year law student and is assisting with the argument. I appreciate the court's indulgence in letting him sit in. This scheme from 2010 to 2015 was basically a fraud factory. This was 90% of their more. It was run almost entirely through runners and they were instructed to require the patients to show up for a minimum number of treatments. We charged the scheme by five different means that I laid out in my brief at page nine. One is that the clinics billed for unnecessary medical care. Another that they billed for treatment that was not provided. We alleged the non-compensable nature of violations of the runner statute. How could you do that in the light of Peach? In light of Peach. Interesting, your honor. Peach is actually an exhibit in this case. Mr. The defendant, Fortune, we got it in the search warrant from his office. He was familiar with Peach and Peach actually in terms of intent to defraud is in our interest. In the end, it's moot, your honor. We didn't prove it to the jury. The jury was instructed not to make a determination of whether or not the runner statute was violated. We could. We alleged it. I'm ready to defend it, but I'm frankly kind of bewildered that that's still an issue before the court. I really, it was one that Mr. Burrell. It seemed to me that the decision when I read it in just the last day, nobody having cited it, is relevant to materiality, to intended loss, to actual loss, to forfeiture, and to restitution. Yeah, but it doesn't, I mean it doesn't take away the materiality of the runners to the insurers who we called to testify. I understand it's, with a specific chiropractor and licensing. It makes the nondisclosure less likely to be considered material by an insurance company. Yeah, but we had the testimony from every insurer, which is just common sense. Of course, it's material. Of course, they'd like to know. What? Yes, of course. Sure, they all testify. Yeah, and the court in that hypothetical situation doesn't make it non-material. The whether that's decided. What's the materiality? If the claim is not rendered non-compensable, what's by the statute? Which is what the Supreme Court of Minnesota said in footnote seven in Peach, which may or may not have been be affected by the subsequent amendment. But taking that as the best indication of Minnesota law, why is it material? It may be the best indication of Minnesota law, but it's not the best indication of what the insurance companies found material. They testified that they deal in a number of states, not all of which have something like the runner statute, but in every state they care about that. I mean, the Peach decision may be testified to that effect. And it's common sense. If you're paying a patient to come get treatment and requiring them to attend a number of, a certain number of treatments, the insurance companies want to know that. They want to know if 90% of your business is coming in that way. I'm sorry for laughing, but the level of fraud here is absurd. And Dr. Homany testified to that. Only to the extent you prove that, that treatment, non-medically necessary treatment. Well, I was getting to, you injected that question as I was getting to the last two means of proving the case, which were the easiest, which is to say the defendants concealed those runner payments by affirmative acts from the insurers and they concealed the payments to that last one. Even though six of the 13 counts. If payments to patients are not inherently fraudulent, where's the fraud? Well, they are inherently fraudulent and it's material. You say so, but what's the case law that establishes that? I can't. You just think it's lousy business, but you know, businesses compete this way all the time. I'm, I'm basing it on what the business people say is material to them. And it's, they would want to know this because they say in our experience, it's indicative of fraud. You don't find runner payments without finding fraud would be Aaron Cobb. Okay. So now we, now you've proven that it's indicative of fraud, but where's, where's the fraud that was proved? Well, we had the doctor. And I'll jump ahead to restitution. Where, where's the proof that individual insurers to adding up to one, 1.5 million individual insurers would not have paid the claim. The testimony in those instances, they would have wanted to know. And Dr. How many testified their actual loss is claims they shouldn't have paid. Oh, I'm sorry. Yes, that the claims that, that the claims paid the gross amount of which was the restitution award were for services not provided or not necessary. Dr. How many testified, I'm not grabbing the transcript page, but Dr. How many testified, for example, that when these patients wouldn't show up for their six visits, it was common to bill for services that were not rendered. Just running away from the question. I'm sorry. I would have expected every insurer who was going to be a recipient of this restitution award should have testified with respect to the claims that are being reimbursed. The claim payments that are being reimbursed in this kind of situation where it's, I think it's obvious that some treatment was provided. It is obvious that some treatment provided, not necessarily that it was medically necessary. It either had to be medically unnecessary or non covered for some other reason for the insurer to be entitled to restitution for paying that claim. On that theory. I don't, pardon? On that theory. Yeah, but I don't see any other basis for actual loss to victim restitution. Oh, for the, I mean, you're talking sentencing. I'm sorry. Oh, well, yeah. Yeah, because I just think the restitution and the forfeiture goes along with it. I see absolutely no proof by the government of actual loss to the victim. I'm sorry. I was confused. I thought we were still talking sufficiency. But in the context of loss, you do get to talk about the runner statute, among other things. It's a felony in Minnesota to build. How does that? Don't forget loss. I know you. I know the loss arguments and they're complicated here. I'm looking at restitution. Restitution to me is a slam dunk reversal almost. These were non compensable. They weren't only if the services weren't provided. No, they were non-compensable under the Minnesota statute if a runner was used, with some limited exceptions, which clearly 90% of the business didn't. But Peach says otherwise. Peach is a Minnesota licensing case. It's not a sentencing guideline. I'm talking about footnote seven, which specifically interpreted the 609.612, which was then slightly, which was then those are legitimate claims that can be billed. These were non-compensable claims under that runner statute, which means they wouldn't have paid them. They should never have been billed. Well, but the jury didn't find that. Well, I'm talking about a sentencing issue, Your Honor. It didn't have to find that in the district court. You're talking about actual and intended loss, which are guidelines issues. You want to talk about loss. I want to talk about 1.5 million of restitution and 1.2 million of forfeiture. That's a lot of money. In terms of making a guideline decision and a restitution decision, those are sentencing decisions having nothing to do almost with the jury verdict. I mean, the jury verdict supports that. But the runner statute doesn't become irrelevant in the sentencing context. Is there any basis other than the runner statute for those losses? And here's why I ask that, because Judge Loken's making a good point, which is, let's say 1.5 million dollars. We'll just rest on that round figure. Some of those may not have been paid because the further investigation could have revealed fraud and those would eventually be non-compensable. I don't know if you proved that or not. But some of those would have been paid. There's no allegation that every single one of those was medically unnecessary. And so then the point comes, does that restitution claim that was ordered rise and fall solely on the runner statute? This goes back to me missing the sentencing context. The first response to that in the sentencing context is the guidelines, the application note. The actual loss, the credit against that for some value received, is received by the victim. That's in black and white in the money returned. Let's talk about that. Okay. The insurance company is getting reimbursed for coverage claims paid. That's what the rest, right? That's what we're talking about. The insurance company is paying the claims, yes. The restitution victims are the insurers, right? Yes. The money there out are coverage claims paid for injured or no fault claimants. Yes. Okay. So if the claim was paid for a service or treatment that was properly, that was actually provided, I say that's an offset. But the guidelines say it's not. It says that offset- You might read our case law on this stuff. I'm familiar, Your Honor. I don't mean to be offended. How can the insurer get a windfall because, oh, well, the services were provided to a third party that I was reimbursing? Good public policy would be one answer. We do not want insurers, and they don't want insurers being able to bill this way. This business was 90%. These treatments were given in most cases. There's lots of civil remedies for what you're talking about. And there's also criminal sanctions for it. And the loss amount for sentencing purposes, the restitution amount- They don't go hand in hand. Yeah, I understand. I understand. I don't understand. I can understand how you could say there was certainly an intended loss, but maybe an actual loss somewhere. But the insurance company is not a victim except to the extent it paid a claim it shouldn't have had to pay. Exactly. And they shouldn't have had. They were deprived that opportunity- That's your legal theory, that these are non-compensable per se. Well, that burden of showing that there was- I mean, you- The burden of showing the offset is on the defendants. And so it's not like at trial, where the government- Are you saying that they waived it by the fact that the trial court did them all at once? No, I'm not. Mr. Burrell was right that he raised exactly that offset issue in his sentencing materials. But it's flipped around from trial, where the government needs to show medical necessity or the lack thereof. Once you're at sentencing and the defendant is looking for an offset for restitution purpose, the burden's on them. And they're not coming in to show that. Wait, wait, wait, wait. The only way to get at this would be to have a hearing at which the insurance companies would have to come forward and substantiate their actual losses by demonstrating, or with the government's help demonstrating, that they paid claims they shouldn't have had to pay. Nobody disputed that they paid claims they didn't have to pay. The question is- I'm disputing it by peach. Your whole theory is that these were, per se, violations of a state statute that has not been construed that way. That is not a theory we used at trial. That is a- But it's a theory you're arguing today for sentencing. Yes. And it wasn't proved. It was proved. The district court did not make that legal determination. It did. Where's the- Okay, where in the- I don't know the record. Where in the record did the district court make the determination? The best place in the record is Judge Davis does a sentencing memorandum at the time, a statement of reasons and sentencing memorandum. I know he does. I know he does. Yeah, he's very careful. And he does a really nice job there talking about the sentencing, about the actual loss, intended loss. And he finds that there was- He doesn't make a finding that every single one was for unnecessary medical needs. But he makes a finding that there was plenty of evidence showing it. Mr. Humney testified to it. We had six counts- But that just means there's a windfall going to some of these, quote, insurers' victims. Yeah. You know, you can look at it as a windfall, but that, in terms of the law, allowing that to happen- But look at some of the bank fraud cases where there are multiple victims and every bank comes in with chapter and verse on what it lost. And if they don't, restitution is not awarded. And that wasn't done here. I'm familiar with the bank fraud, in particular, Markert. You and I went back and forth on that, and, of course, you get to decide that. But those circumstances were very different from here, where the victim doesn't have the money, doesn't have any of it. They are out that money, and if the defendant wants to- To the extent they paid money, they should have paid. They were not a victim. They were a victim in terms of being deprived that information. Pardon? They were deprived the opportunity to investigate fairly at the time of the- That's not actual loss. For guidelines purposes, and I think for restitution purposes, it is. And I understand I don't get to decide that, Your Honor. But that comes down to- I go back to my original question. This all relies on the runner statute, you know? I mean, at least in large part. I mean, I don't see another theory where you can get around the fact that- As to actual loss. Right. To me, that's the easiest one. And you get pretty much there on that. It's a felony to do these things, and that is a state- Which is the runner statute. It is. Okay. And it reflects the state interest in not allowing chiropractors and other practitioners to do this in an area that is full of fraud. What I'm trying to get at is I'm just trying to figure out what the issues are. So at the sufficiency stage, we have a different materiality argument, as you talk about. I mean, yes, the although it doesn't appear at the time of final verdict to have been relevant. But at restitution, it seems to all fall, and maybe for actual losses, on the runner statute. I think that evidence at trial regarding the purpose of this business, Dr. Hummony's testimony, the undercover tapes show that the doctors didn't care. I'll give you an example. I'm just making sure. It seems like I've been up here long enough. An example on tape with the undercover tape is the FBI agent is asking about bringing in another, being a runner, basically. And they're talking about a potential claim with Dennis Black, another FBI agent, that he rejects. And Mr. Forthoon, or Dr. Forthoon, talks about the difference with the settlement at the end. He really, he doesn't, he's not interested in getting reimbursed per treatment. He's interested in the payout at the end, which comes down to, for example, fault in the accident. He doesn't want to treat someone for the fault in the accident because there's this fraud under the table going on with the settlements. He gets his big payout from the settlements through the attorneys that he's working with. That's in the record. And so in terms of Judge Davis giving us a reasonable estimate of what should be restitution, the fraud was far beyond that. Let me ask you this, though. Why not present evidence from the, you had every insurance company executive, I don't know if there were adjusters, but there was somebody from like seven different insurance companies. Why not simply ask them the question, so when you have a runner, they certainly keep statistics on this stuff, I would think. When you have a runner, 50% of them turn out to be fraudulent. They shouldn't have been paid. 40% of them turn out to be fraudulent. Because then you'd have some estimate of actual losses. So I don't understand why that testimony, and maybe the testimony is there and I just missed it. Yeah, I'm not aware of it. Give me one second if I may. Sure. Yeah, no, I recall that. I do recall Aaron Cobb's testimony, which was essentially you don't see runners without fraud, everyone. And if that's that one insurance company, but it's consistent with what I'm talking about, the rest of the testimony, the rest of the undercover tapes at But it doesn't mean there was injuries. And I want to, I guess, highlight a point. Chiropractic treatment is particularly conducive to this fraud, because there's value in the treatment to the patient. You know, professional athletes get chiropractic treatment and massages and electronic treatment to be better athletes, but that doesn't, that's not a physical injury. So people are coming in, they're getting real treatment, but not treatment that the insurance companies should be covering. Not treatment that should be billed into my own insurance rates. That's, there was real treatment going on. We don't dispute that. It was valuable treatment, but not for the insurers. That was fraudulent treatment. Sorry, I'm getting out of breath and trying to answer your question. Okay, thank you. But you would point me to that and cite it in the brief. On the runner defendants, now that the five theories have been limited down to a materiality verdict, how, what's, at least that seems to be the discussion this morning, how are the runners liable for, as conspirators or aiders and then even if they knew that being a runner was suspicious, I expect they did, and so therefore was not to be over, be disclosed, what obligation, what ties them to an obligation to disclose to the insurers? Fair question. And we proved it at trial. Judge Davis assessed that and gave some detail beyond the overarching scheme, which was, you couldn't really work for this company without knowing that there's this scheme. I'll cite a couple witnesses' testimony. For that point, there was a runner, Zalima Calderon, who was also a patient, and she was, she worked, got legitimate checks from the office, but when she was a runner, she got cash. It was a common practice. She worked around the same time as Carlos Luna, and Carlos Luna did some legitimate driving for the, for the clinics. When he lost his driver's license, she needed to drive him to pick up his clients, and he needed to be there because he's the one prodding them to show up for the treatment. She talked about how that is, I mean, and she talked about, and Dr. Homany talked about, that's what the runners do. They all knew what they were doing was prodding these people to come in and getting paid for it. For Luna as well, you see it most evidently in what Mr. Hawkins talked about, where Mr. Luna is telling one of the patients, don't tell, don't tell anyone how you got referred to the clinic, and she testifies, that, that bothered me. That didn't seem right, but that's really good evidence of knowing participation in the scheme to defraud. For, for Mr. Well, but the scheme to defraud has been narrowed down to just material non-disclosures to insurers. I don't think you get to read that into the jury's verdict, your honor, and I don't think it's... Then we're back to what, then we're back to whether it's the violence, the runner statute per se. No, I think, I think we proved, it's harder to say it on the individual counts, but on the conspiracy count, there's the testimony of Dr. Homany that they're billing frequently or often for treatments that aren't provided, and that they're treating kind of irregardless of, he claims piece, person by person that they, for all he knew, needed treatment, but his outline on direct is we're maximizing payments, we're maximizing treatments to get, get payments, and that had nothing to do, it was regardless of how much, how many treatments did the patients need. So you would say the minimum amount of treatments is enough to make an inference of knowing participation in the, for the jury, absolutely. Yeah. I mean, it really is what I call, and it's, it's hard to get from, from briefs and this is a huge record, but when it's hard to sit through that trial or read that transcript as I've done twice, it all weighs into each other that this, the whole purpose was, was fraud and the runners back each other up. Is there a difference between, and I forget which one had the prior experience with another clinic. I think it was Hussain, was that? Yeah, I was about to get to that. And is there a difference in the way we would treat Hussain and Luna for those purposes in the sense that maybe there's a greater inference for Hussain who had done this before than there is for Luna? Yes, no, there absolutely is. That was the, I mean, Hussain is an easier case. I started with Luna because of that. Hussain, Dr. Homany testified that Hussain was one of their main runners during the time, at one point in time for about a year. Hussain also came to this clinic after being a runner for Schultz and we saw some of the text messages with Schultz that post dated that time. But it's the, it's the, it's Dr. Schultz in a separate case, this relates only to Hussain, telling him that his clients are pieces of crap and because they're not showing up for their treatments and he's got to get out there and get them. And then they, the point is you got to bring them in here whether they need treatment or not and you're not going to get paid if you don't. That was the 404B evidence? It was 404B evidence. But good in terms of knowledge and intent, that's, it's really classic 404B. You don't get much more 404B than that, I don't think. For Hussain as well, he did pay cash to at least one of the witnesses, but that was the whole practice. Everybody paid cash and it really, it folds back into what I find just patent fraud is paying patients to come get treatment. The runners were paying the patients, they were getting paid to recruit them, they were being paid to keep them quiet, you know, tell them the lines. And so as to Hussain, I can look in my notes and go further, but I really think that it's a good question, your honor, what, how do these people, how are they different? But they're part of this scheme and they're woven into it. It's corroborated by the text messages to and from them, the number of phone calls going through them. They were part of this scheme and we proved it really through direct testimony of Dr. Hummony and corroborated by direct statements to the undercover officer by Mr. Forth-Thune. I'm certain I've failed you in some ways and I haven't done my best. I'm happy to try and answer any other questions you may have. Thank you. I think you've covered what I thought would be helpful to talk about. Oh, thank you. I want to just review a little bit of this case that I think will help you understand further some of the questions you've been asking. Initially, when the indictment came out, I looked at it and my interpretation of it is that it alleged the violation of the runner statute. There was a case that Judge Schultz had written that cited in our brief, the Illinois farmers case, that was a kickback case. It was a civil case. He said, well, even if there's a kickback, if the insurance company is providing medically necessary treatment as they're required to do under the no-fault Act 65B, then there's no mail or wire fraud. So I raised this issue and then the government alleged in the next indictment that the treatments were medically unnecessary. My take on it was it was trying to do an end run to run Judge Schultz's opinion. Then later, we pushed about a bill of particulars to understand which patients the government intended to prove with their expert had received medically unnecessary treatment because it seemed to us, to me at least, that the way to do this would be to have an expert come in and say he looked at the files or she looked at the files and examined the patient perhaps and this treatment was not medically necessary. So what happened at trial was their files and then went on to opine, as I understood it, general information about chiropractic treatment. So then there wasn't any medical testimony in front of the jury from which to their inference that they argued to the jury that if a patient is procured by a runner or paid as Mr. Cheever just talked about, then ipso facto the treatments were medically unnecessary, which isn't correct. And so the way that the case was tried, in my view, is that it was entirely based on this runner statute. That's what the case was always about. That was really what the government argued. What about the fact that opposing counsel says that kind of fell out of the case at the end, that yes, it was it was part of the indictment, but it really, really didn't form the basis for the verdict? Well, he said that, but what I said, I would return to what I said in my opening argument. The argument that the government made that I read, the allegations in the jury instructions as to 15 and 16, which is the mail fraud and wire fraud instructions, direct the jury to the no fault insurance scheme in the indictment. The indictment says that it first talks about runner statute and alleges that Forthune violated the runner statute, that he made illegal kickback payments to these runners, and that any payments made in these circumstances are non-compensable and uncollectible, or whatever the words are. That's the effect of it. And then they say, well, and by the way, don't pay any attention to the runner statute, which seems to me to be hard to do. So I don't think it's correct that the government walked away from the runner statute. I think they embraced it, and that's what they encouraged the jury to convict these people on. It wasn't a materiality theory. It was that the runners were paid. You're not allowed to pay runners under Minnesota state law. It's a crime under Minnesota state law. It's non-compensable under Minnesota state law. And by the way, the way I read that statute, 609612, this non-compensable piece, can I finish this? I have like three seconds here. May I finish, Judge? Yes. Thank you. It's in the penalty section. So it's only non-compensable and unenforceable if there's a felony conviction. That's the only Achiever says the felony was proved, but that wasn't proved. Thank you very much. My time is up. Thank you, counsel. It's a complicated three cases and well argued and thoroughly briefed, and we'll take the three under advisement.